May it please the Court. I'm Brian Rademacher, here with co-counsel Heather Williams from the Federal Public Defender's Office, and we represent Appellant Wright. Today I would like to address just two of the matters that Wright has raised in this appeal. The first regards the cumulative prejudice of the two errors that this Court in the first appeal found. Could you either speak up a bit, or are you closer to the mic? I'm sorry. Sure. The first matter I'd like to address is the cumulative prejudice of the two errors that this Court in Appeal No. 1 held had been committed with respect to his third-party culpability defense. And the second is the involuntariness of Wright's statement because of Agent's promise that he would not be arrested if he talked to them no matter what he said. Counsel, before you go to any further, just to clear up on that second point, in case you run out of time, was he ever arrested? The agent testified at the end of the suppression hearing that he was not arrested. He was summonsed in after he was charged. Right. Was he ever arrested? I'm sorry? Was he ever arrested? No. He was summonsed in after being indicted. Thank you. Not physically taken into custody. I've taken you afield. I think you were going to talk about cumulative errors. I just wanted to make sure I got that question asked. Okay. I hope to come back to it, too. But with respect to the cumulative error, Wright is entitled to a new trial if, absent the two errors undermining his roommate-dated defense, any juror might have entertained a reasonable doubt about his guilt on the possession count. The government can't prove otherwise because, first, this case came down to a credibility contest between Wright and the agents, with Wright denying guilt and saying he made no admissions and the agents saying otherwise. And, two, the errors significantly undermined Wright's credibility. The first error, keeping out evidence that Wright's claim was true. And the second error, adding evidence and the weight of the prosecutor's opinion that the claims were false. The erroneously excluded evidence of the roommate's computer savvy and sexual interest in minors would have bolstered Wright's claim because, instead of just showing that he had the access to the computer, it would have shown that he could have committed it because of that access. It would have shown that he likely committed it because he had the motivation, the sexual interest in minors, and the ability to put those images on the computer and manage the file server because of his computer savvy. Without that evidence, Wright was really the only suspect. And the jury had little alternative other than to convict. But with that evidence, the jury had reason to believe, would have had reason to believe, as Wright said, that he didn't put the images on the computer, somebody else did, his roommate. The egregious misconduct of the prosecutor, where he, well, significantly undercut Wright's claims. But he told the jurors, based on his personal experience in handling many of these kinds of cases, that Wright's roommate did it defense was a sham. With this, the jury had improper evidence that Wright's claim was false. Without it, the jury would not have been biased by a trusted government attorney's Now, the combined damage of these two errors was made much worse by the prosecutor exploiting these errors in closing argument. He repeatedly told the jury, you can be sure, one, that Wright did not commit the offense, or did commit the offense, because our evidence shows he has the computer savvy and sexual interest in minors to put these images on the computer. And, two, they can be sure that Ditforth did not commit the offense because – and that Wright's claim was a sham because there was no such damning evidence against Ditforth, since the attorney, the Wright's attorney, failed to keep the promise she made in her opening statement to present evidence, and the prosecutor said, you're still waiting to hear such evidence. So in light of this, a jury, absent the two errors, easily could have had reasonable doubt about his guilt. Contrary to the government's argument, the statements are insufficient to prove that the jury would have convicted regardless. First, we don't have to look any further than the prosecutor's own words in closing argument to assess how important that was to the government's case, even with the statement. It repeatedly emphasized how the evidence of computer savvy and sexual interest in minors pointed directly to Wright, but not to Ditforth. Second, Wright adamantly denied the version, the agent's version, of the alleged statements, and we know that the jury had doubt about who to believe, because the only question the jury asked during its deliberations was could it see Agent Andrew's report of the interview of Wright, and could it see the in-court testimony of Wright. And there's a comparison of these competing versions in the ER at page 270. Third, there were good reasons for the jury to believe Wright and disbelieve the agent, and we've set forth a lot of those in our briefs. But the excluded evidence could easily have made the difference, because it would have provided the jury with that alternative explanation that they needed to believe that the images could have been put on the computer if Wright did not put them there. And finally, the forensics evidence would support such a belief. We've put Exhibit 15 in the excerpts at 319 to 322, and that establishes that all of the count three files containing pornography were put into the file share folder in the D drive of Wright's computer between December 8, 2002, and February 12, 2003, starting four to six months after the roommate arrived in Tucson in mid-August of 2002 and began living at Wright's apartment. In light of all this, the government can't prove that no juror might have entertained or would not have entertained a reasonable doubt that Wright was responsible for putting the images on the computer. And the standard should be proof beyond a reasonable doubt, because considered in combination, these errors deprived Wright of the ability to present an effective third-party culpability defense. And the outcome should be the same, even as a preponderance, because the government just can't prove that no juror might have entertained a reasonable doubt about his guilt. But I would like to talk a little bit about the statements, and I want to focus on the promise, because that is a legal issue that the Court can review de novo since it doesn't require getting into some of the factual issues we've raised with respect to other aspects of the statements. And the reason for this is that the district court, in its order, made an express finding that Wright, quote, was promised he would not be arrested no matter what he said. So getting back to the Court's question, the government argues that the promise was limited to the agent saying, we won't arrest you just today. But factually, that's not true, and it's not what the district court found. Taking found, taking a look at its order, that finding is an unconditional one without limitations, just that he would not be arrested no matter what he said. So how is that – how does that jive with this excerpt 176, volume 2, where Andrew said he was never arrested, he was summoned? Well, because, as we've cited case law, and as courts have concluded, a promise not to arrest is objectively understood by a reasonable layperson to mean I'm not going to be charged. And in this case, what the agent should have done and could have done was to tell him, listen, you can talk to us, you can confess your guilt, and we're not going to arrest you. What they should have done in addition to make sure that as a reasonable layperson he would understand what this meant was to clarify, but we're going to look at this and we're going to use it in the future to charge you or arrest you. As a matter of fact, that's what they intend to do in all these situations. And it's obvious why they don't do that, because to say those extra things clarifies exactly the limits of a promise not to arrest. You won't be arrested, you might be charged. In other words, they left out that you might be charged first. And that's what the cases that we've cited, particularly the Rodgers case from the Fifth Circuit in 1990, they've come to that conclusion. I mean, there's not a lot of analysis in those cases, but in that case it was very similar about an arrest – and there's another case, the Hilliard case, where the individual was going to be – was told to come in and talk to us, cooperate with us. And if you do, rest assured, you can leave here and go home and sleep in your own bed. So even a promise that seems limited to not going to arrest you that day, the courts interpret as a specific promise, because even if it was limited to that day, the specific benefit is not being arrested, not taking – being taken into custody, and that Hilliard case, I believe, is the one case where most close – closely in fact to this, where that was found by the court. But it is common on – when the execution of search warrants for the officers to say, you're not under arrest, we're not here to arrest you. It might be, but what Agent Andrews testified to, and I have a cite to that, is that we as Federal, the Federal – the Federal agents have a practice when we come in that we don't arrest at that time. But she said that the State agents often do. And what's important here is not – But I'm – often in a search – in an execution of a search warrant, if they're not going to arrest, then – then usually they tell the person, when they're executing the warrant, we're not here to arrest you. Well, that might – that may be, but not here to arrest you. You know, this one was coupled with a specific promise. Not only are we not going to arrest you, but if you talk to us, whatever you say will not be used against you. No, I understand that. I'm sorry. What do you make of the – you know, this case was remanded, and the district court made specific factual findings and said your client was Mirandized, that his statement was voluntary. What – how – how should we treat that on appeal, because obviously we have to give those findings some deference? Well, with respect to the promise, I think there are – essentially, the district court found that a promise was made, and so deference – and without any limitation. So as to the – what we were just discussing, there is no contrary finding. The finding would support that, as would Agent Andrews' testimony, who didn't put such a limit on it. With respect to other circumstances – so our position is the promise alone is sufficient to render the statement voluntary, but that the court could also consider it in the context of – of other inducing pressures and coercive pressures that were exerted, because they exerted force when they – they used a great – it was a great show of force when they entered the apartment, physically took him down, handcuffed him behind the back and kept him on the ground. Then they isolated him in the car. They prevented him really from leaving the car and the questioning because he was effectively in custody under Craighead because of the police domination of his house, and he's just waiting outside. I think that the – How did they prevent him from leaving the car? Is it because of the domination of the house or – Right. And I'm talking about the Craighead factors, and I – just briefly, back to Judge Thomas' question, is that the facts supporting these kinds of inducements and pressures aren't really in dispute. So with that, there is not a deference to the factifying of the district court that's against our position on these inducements and the coercion. But the difference in Craighead is that he really was – I mean, there was really no way for him to leave, and I think everybody can see that. Well, in this case, Wright didn't – he was woken up in the morning. He had his sweatpants and a vest on. He didn't have any shoes. He didn't have any ID. He didn't have any phone. He didn't have any keys. It's cold and rainy outside, and they've got him outside. He can't – where can he go? He can't leave. He can't go back to his house. The police domination is actually greater, I think, here than it was in Craighead, particularly because the great shore force, that didn't occur. There was – there were vests and some guns in Craighead, but in this case, there were vests and guns and shouting. And on top of that, they used physical force to put him down. And that's a scary thing. So I'm sorry, I think I didn't answer your question. You did, actually. It's fine. Yeah. Do you want to save your last minute for rebuttal? I would like to do that. Thank you, Judge. May it please the Court. My name is Bruce Fergus, assistant United States attorney on behalf of the government in this case. I think that the argument that is being presented is a little bit backwards, because we're trying to assess cumulative error without accepting the fact that the district court did what the prior panel told it to do, provide adequate findings for the denial of the suppression motion, so that all of those inculpatory statements that the defendant made were properly before the jury and are to be considered, not only for sufficiency of the evidence, but in assessing was there a cumulative error that warrants reversal. Secondly, this Court has to bear in mind that although it didn't go to the final step of a formal cumulative error analysis, the prior panel looked at exactly the same arguments that are being made today. They looked at all of the alleged misconduct found by the prosecutor, found that, yes, some of it was wrong, some of it was not wrong. It was permissible. And specifically found that that was harmless error. They used the specific harmless error analysis. Then as far as the Dittworth-related evidence, that was analyzed under a plain error standard, because it was not really objected to appropriately. And again, they said this is all cumulative to all of the evidence that was in front of the jury showing that Dittworth, at least in theory, could have been the guy, could have used the computer and so forth, and they specifically found under the plain error prejudice standard that it would not have affected the outcome. So the Court now is not really operating on a clean slate. You're looking at findings by the prior panel which have already analyzed all of these arguments exactly as they've been made, but now we have the conclusive factor that appropriate findings were made. And so all of those highly inculpatory statements about, oh, well, I've been maintaining this server for a long time. I know there was child pornography on there. In fact, I was thinking about deleting some of it. I got rid of the bestiality and baby porn stuff before. Obvious knowledge, obvious sorting, obvious selection of the way the thing was being set up. So this is not a close case, evidentially. And that is a major factor in assessing cumulative error. We already have the prior panel's findings that there wasn't a whole lot of prejudice there, if any, from the alleged, from the arguments that have been made. But now you have the overwhelming inculpatory evidence that they were not able to consider at that time, which is that those inculpatory statements were, in fact, properly admitted. So when we get back to the arguments that has been made about whether or not, oh, just before I forget it, counsel directed this defense counsel to exhibit 515 in his excerpts of record. And as a matter of fact, when we look at page 3, we find that there are actually two, pages 2 and 3, there are a number of these child pornography files that were actually put on the computer long before Mr. Dickworth arrived on the scene through means of the Panzer program. And one of those on page 321 of the excerpts, excuse me, page 320 of the excerpts, is the 11 Daddy Teach 006 file. And that shows up that it was on there in January of 2002, even though Mr. Dickworth didn't move in until August of 2002. So what we have is the defendant using Panzer and FreeServe for years to accumulate these multiple megabytes that the computer experts said could not have been sorted out in the way that they were in a couple of months, as the defendant suggested Dickworth had done. So the computer evidence itself is extremely strong about what the defendant was doing, and he basically admitted to it. So when we put this up against cumulative error, there's very small, if any, error or prejudice to be found, according to the prior panel. And now we have conclusive evidence, basically, his own admissions, that he knew that pornography was on there, he knew it was children. In fact, I guess he had some standards. He had taken out the bestiality and baby pictures, but that still didn't eliminate all of the other preteens that were found. Counsel, what's your response to opposing counsel's argument that those statements were involuntarily made? Well, the district court basically heard all the evidence, which you are not in a position to do, and assessed the credibility of the agents versus the defendant, and specifically found, underlined it in its order, as a matter of fact, that he is not credible. His version is not to be accepted. And to the extent that there is emphasis being placed on this so-called promise, what did the court find? He's promised that he would not be arrested. He wasn't arrested. What the defense wants to do is read into that and inference that means never arrested, but more than that, never prosecuted. Nothing would ever happen, which is simply not a logical conclusion. Well, his argument is that a layperson would understand it to mean that, particularly under such stressful circumstances. Well, we don't have an ordinary person here. There's also testimony, and I gave the specific sites in my brief, where Mr. Wright specifically testified that he knew that there was going to be a problem, since the FBI were even talking to him, and specifically that he did not rely on that. He said, despite whatever they were telling me about it being voluntary and so forth, that I could get up and leave, that he believed that they were going to come after him. So there was no reliance. And that's the key. The question was not in the interrogation. Right after the question, the statement, is when he then confessed. And the fact that you read more into it than the literal words is clear in Henry v. Kearney, where they said, listen, what you tell us we can't use against you right now. We just would like to know. Well, they read the court said that was a slippery technique, that of course, right now means not just right now. It was intended to make the defendant think you wouldn't use it at all. So we don't interpret these words within the narrow literalness of it, but what people would think. If you think you're not going to be arrested ever for this, that to a normal person, an average person, means we're not going to take further action against you. It's not that just we're not going to arrest you. We're not going to do something even worse. We're not going to execute you. If we're not even going to be arrested, it leads somebody to think, well, they're not going to – if I just tell them the truth, which is all they want, and it's all voluntary, as they tell them, that means you're not going to take further action that's even worse than arresting me. That's what Kernan seems to say. Well, the critical point here, though, is that it wasn't simply we won't arrest you. I gave the citation specifically, Englander testified that the statement made was we will not arrest you today. So that's why it was not logical for the defendant to assume that he would never be prosecuted, and apparently he didn't. Well, how does that differ from Kernan, which says we can tell you we can't use it against you right now? They said that meant to an ordinary person, you're not going to use it against you, not just right now. I'm sorry. Can you direct me to the Kernan cases, all the cases we talked about? That one's escaping me. That's Henry v. Kernan at 197, 5th, 3rd, 1021, which I think is their principal case, in which the Court said, when the detective said, listen, what you tell us, we can't use against you right now. And our Court said that that would lead somebody to think you weren't going to use it against them at all. And, you know, furthermore, as the Supreme Court said, you only need a slight promise to undermine this. In Preston, we quoted Hutto v. Ross saying, false promises stand on a different footing. In particular, the Supreme Court has observed the test for voluntariness is whether the confession was extracted by any sorts of threats or violence or obtained by any direct or implied promises, however slight. That, if I may, that is exactly the critical point, whether this so-called promise led to the extraction of the information. But Mr. Wright specifically said that everything I said was voluntary and that he was not relying on those promises. He was told it was voluntary. In that very extraction, he was told that this is voluntary. So he said that everything I said was voluntary. That's a legal conclusion that they had told him. They said he was not under arrest. And no matter what he said, he would not be under arrest and that his statements were voluntary. That's what the officer testified she told him. That is exactly what an officer is supposed to tell you. You don't have to talk to them. Well, you can't be blamed for saying it was voluntary when that's what he was told, it was voluntary. Well, he he his testimony was that it was voluntary. He didn't say I was adopting this legal conclusion from the officer. He said that's what I did, that everything I said was voluntary. Yeah. Well, either either he believed the officer and shouldn't have, or the officer thinks he shouldn't rely on the officer's statement as being the truth. She told him it was voluntary. He said, yeah, everything I did was voluntary because that's what she told him he was doing. Well, he said that at the time to the officers. He changed his tune when he came in front of the district court and the district court said he's not credible. And I think that that's what it's not a matter of credibility. All the district court said was he was not promised anything other than that he would not be arrested no matter what he said. The very last line of the order that I quoted in the brief, the district court expressly found that the agents were credible and the defendant was not underlined. So he was making it very clear that he was not accepting. There's no credibility question here. Everybody agrees on what the officer said to him. It's not a question of no. The officers don't dispute what they said. And to the extent that we're looking at the implications, potentially, of what this uncontroverted statement that he was told you would not be arrested today, and he wasn't and never was, then it comes down to, well, do we infer that we should believe Mr. Ditforth when he said, well, I said it was voluntary, but it really wasn't. I felt like I was being bribed or coerced or misled in some way when what they told him was objectively and legally correct, and they followed up on it by doing exactly what they said. They didn't arrest him. In fact, there was testimony from them that he was not really a suspect at that point. Obviously, they had some suspicion, but they would not even call him a suspect because, first of all, they found another person in that apartment that they had not expected to find. And until they actually looked at the videos in the computer, there was no way to really pinpoint anyone as, in fact, a suspect. So they're saying, we want information about this. You know, we're all ---- Sotomayor was it true when she says to him that he would not be arrested no matter what he said, he was not going to be arrested? Was that truthful? To the extent that it was clarified by the statement today, yes. Well, the statement was made at ER 172, and I don't recall where the ---- where it said today, but it doesn't in that statement. He was actually in Detective Englander's testimony, and at the moment, I know it's in there. That wasn't the district court's finding. The district court's finding was that he was told he wouldn't be arrested. Right. And he wasn't arrested. I understand your argument is that he wasn't arrested. But the district court didn't make a finding with his distinction about today or tomorrow or ---- No, it did not. I see my time is getting short here. I would just like to point out that the defense counsel suggested this New York State v. Hilliard case was perhaps his strongest or best case for supporting this idea of drawing these kind of inferences. But the important thing is, when you read that, the Hilliard is based on a State rule of criminal procedure, which is talking about voluntariness of confessions, but ultimately on the old, old United States Supreme Court Bram case. And Arizona v. Fulminante specifically said that Bram is not the appropriate standard to apply, that you look at the totality of the circumstances. And so even if we want to accept, you know, this one isolated fact, that he might have assumed this, that this was some kind of a promise, which, honestly, I do not find logical under all the circumstances, then there's everything else that's going on. And ultimately, again, the ---- looking at all of this, and these are the same kind of arguments that were put in front of the district court, which is presumed to have considered all of the evidence and all the arguments made before it, it found that both the statements themselves and the Miranda waiver were knowing, intelligent, and voluntary, which it could not have done if it had accepted the construction of that so-called promise that the defendant is pushing. Thank you, counsel. I'd like to make a couple brief comments about each issue. First, I'd just point out, as Judge Kristin was saying, that Judge Collins' order is without limitation, and that fits with what Agent Andrews said in 172. He's relying on Agent Englander, and there are several reasons not to rely on him, because it doesn't show it's a direct quote. He changed his testimony just a few pages later when he said in answer to whether he said yes, whether he remembered Agent Andrews telling him he wouldn't be arrested afterwards, different than that. Second, you know, judges and lawyers can understand these subtle distinctions about what arrest means. That carries with it, even Black's Law Dictionary carries with it is the connotation that you're going to be arrested as a result of charges. People connect that. Especially people ---- Now, Judge Kristin's testimony, and they ask him about, they describe, he testifies about the promise, and did he feel free to leave, and he said no. I was under the impression I was going to be taken away no matter what I said at that point. Well, that's the ---- So, I mean, doesn't that ---- it sort of undercuts your ---- Well, I don't think so, Your Honor, and the reason is that that's taken out of quote because that's when he's talking about how he felt as a result of a threat he said the agent made, if I don't arrest you, just a couple pages beyond that. I think it's at ER-224, maybe. But he says, here's how I felt once they made the threat. There's a promise, and then there's a threat. So ---- Well, I don't see anything about a threat on that page. In the page ---- They're talking about a ---- he said you say you're free to leave, that's what they're saying, but you have armed people in your house. That's what you're talking about. In the preceding pages, he's first talking about the promise, and then he talks about ---- and it came to ---- he said, first what happened is they said, listen, say anything you want to us, we're not going to be ---- arrest you. But then it came to, however, if you don't say anything, we don't want it to come to arresting you. So that was the threat. There was a threat, and what the government, the language he's citing is how he felt in response to a threat. The district court didn't believe there was a threat. The district court wouldn't rely on statements he makes about how he felt in response. So it was two ways. One ---- But why does it make any difference? I mean, he says, I thought I was going to get arrested, so ---- Well, because ---- He obviously didn't believe the promise if you take his testimony. He's talking about a threat. If there was a threat and the court found a threat, I think if you read it all together, he's talking about both the promise and the threat. Well ---- But your argument depends upon this statement, we're not going to arrest you, lulling him into thinking it was okay to talk. And that's the import, it seems to me, of the passage that Judge Thomas is citing, which is that your client, it sounds to me like he wasn't lulled into anything. He didn't trust these folks. I think he was pushed from both sides. He had a promise, as he explains, and then they said, but if you don't talk to us, that's a threat. We'll arrest you. So, yeah, in response to feeling this threat, he felt like now he couldn't ---- he was going to be arrested no matter what he said. But as far as the promise, and he even makes a point at the end of his testimony, he says, well, that was contradictory. What they said about the threat was contradictory to the promise. But you have to accept both to accept and rely on his statements in that discussion. A couple of questions ---- a couple of things just about the cumulative error. This Court determines whether there was cumulative error. It can look at the qualitative difference between was he capable, did he have access versus why he might want to commit the crime, and, you know, could he do it because of his computer savvy. Two, if we take a look at the Parle case, that's a case talking about just the significant damage it does when both errors, as here, undermine a defendant's credibility in these kinds of cases. And the ---- I guess my time is up, Your Honor. Thank you. Thank you. The case is argued and will be submitted.
judges: Reinhardt, Thomas, Christen